UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PATRICK S. LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-02655-DLP-TWP |
| | ) | |
| MENARD, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>O<small>RDER</small></u>

This matter comes before the Court on the Defendant's Motion for Summary Judgment, Dkt. [70], and Defendant's Supplement to the Motion for Summary Judgment, Dkt. [99]. For the reasons set forth below, the Court **GRANTS** Defendant's motions.

### I.    Background

On June 11, 2017, Plaintiff Patrick Lewis was shopping at a Menards store in Carmel, Indiana. (Dkt. 1-1 at 4). As he was exiting the store while pushing a shopping cart filled with over five hundred pounds of floor tile, Plaintiff alleges that an uneven walking surface caused him to fall and suffer injuries. (Id. at 5).

Plaintiff testified that he had been to this Menards approximately ten times prior to the day of the incident, and thrice in the month prior to the incident. (Lewis Dep. 6:23-7:22; Dkt. 76-6 at 6-7). Plaintiff then admitted that he always came in the entrance door and out the exit door, and that he had previously exited the store with various supplies. (Lewis Dep. 8:25-9:11; Dkt. 76-6 at 8-9). At no point prior to

1

the incident did Plaintiff report any dangerous conditions on the property, or think to himself that any condition on the property might be dangerous. (Lewis Dep. 10:5-13; Dkt. 76-6 at 10). Mr. Lewis testified that in the months leading up to the incident, the parking lot area contained old asphalt, with spots that were bad and spots that were okay because they had been resealed or patched. (Lewis Dep. 29:2-11; Dkt. 76-6 at 29).

When asked whether he recalled cracks or breaking in the cement, Plaintiff testified that he guessed cracks would be present because of the nature of concrete, but that he was not sure. (Lewis Dep. 12:4-15; Dkt. 76-6 at 12). He also testified that the flooring inside Menards was relatively flat, but was not certain. (Lewis Dep. 12:16-20; Dkt. 76-6 at 12). Mr. Lewis testified that there is a slight change in elevation, a kind of ramp, that takes you from the exit door down to the parking lot area. (Lewis Dep. 26:22-27:8; Dkt. 76-6 at 26-27). Plaintiff noted that the elevation change on that ramp of the exit area was the same each time he visited the store. (Lewis Dep. 28:16-22, 61:24-62:3; Dkt. 76-6 at 28, 61-62). Plaintiff also testified that there was an area between the sidewalk and parking lot that was "bumped up" and that this area looked the same on each of his visits to Menards prior to the incident. (Lewis Dep. 61:13-62:3; Dkt. 76-6 at 61-62). Mr. Lewis saw no changes or modifications to the Menards exit area in the month before the incident. (Lewis Dep. 28:23-29:1; Dkt. 76-6 at 28-29).

When he entered the store on the day of the incident, Plaintiff noticed approximately 40 standard shopping carts, and grabbed one for he and his wife to

use. (Lewis Dep. 33:2-34-1; Dkt. 76-6 at 33-34). Mr. Lewis took the shopping cart

back to the tile section, where a Menards employee discussed the various mortar

and grout options with him and his wife. (Lewis Dep. 34:6-18; Dkt. 76-6 at 34).

Plaintiff claims that this same employee helped him load 8-10 boxes of tile into the

cart, while Plaintiff's wife testified that only the Plaintiff loaded the tile into the

cart. (Lewis Dep. 30:11-15, 34:6-18, 36:5-17; Dkt. 76-6 at 30, 34, 36; Brittney Lewis

Dep. 15:6-20; Dkt. 71-8 at 5). Because there was no surveillance video for the

loading of the cart, Mr. Lewis admitted that it was possible his recollection was not

one hundred percent accurate. (Lewis Dep. 43:9-17; Dkt. 76-6 at 43). The same

employee who discussed mortar and grout options offered Mr. Lewis a flatbed cart,

but Mr. Lewis did not put the tile on the flatbed cart because it was already loaded

in the shopping cart and he did not see a reason to move the tile. (Lewis Dep. 38:12-

39:6; Dkt. 76-6 at 38-39). Mr. Lewis noted that he only had difficulty when trying to

turn the cart, due to the weight of the tile pushing the cart down so hard. (Lewis

Dep. 40:25-41:13; Dkt. 76-6 at 40-41).

At the checkout line, Mr. Lewis was asked if he needed any assistance

loading the tile into his vehicle; Mr. Lewis responded that he did not need

assistance. (Lewis Dep. 44:13-19; Dkt. 76-6 at 44). As he was exiting the store,

another Menards employee asked Mr. Lewis if he needed assistance loading the tile

into his vehicle, to which Plaintiff responded no. (Lewis Dep. 48:4-12, 49:1-15; Dkt.

76-6 at 48, 49). As Mr. Lewis was pushing the shopping cart down the slight decline

at the Menards exit ramp, he could feel the cart picking up speed and was

physically holding the cart back from generating more speed. (Lewis Dep. 50:18-
51:6; Dkt. 76-6 at 50-51). He was using both his physical strength and his weight to
prevent the cart from going too quickly. (Lewis Dep. 52:5-15; Dkt. 76-6 at 52). At the
time Mr. Lewis was exiting Menards, he did not think that the threshold between
the concrete and asphalt was a hazardous condition or a possible safety concern.
(Lewis Dep. 68:17-19; Dkt. 76-6 at 68).

Plaintiff testified that the shopping cart wheels hit the threshold, causing
him to feel like he was falling forward and the cart was lifting off the ground, and
Plaintiff described the moment as feeling like he was hitting a wall with the way
the cart changed speed at the time it hit the threshold. (Lewis Dep. 48:15-21, 65:1-6;
Dkt. 76-6 at 48, 65). Plaintiff further claims that the threshold was in such
disrepair that when the cart's wheels hit the threshold, the cart stopped moving, the
rear wheels went up, and the cart tipped over. (Lewis Dep. 53:18-24, 79:21-80:14;
Dkt. 76-6 at 53, 79-80). After the incident, several Menards employees approached
Mr. Lewis and asked if he was okay. (Lewis Dep. 62:21-63:10; Dkt. 76-6 at 62-63).
Mr. Lewis spoke with the store manager and approximately two other employees;
they had Mr. Lewis pull up his truck so they could help him load the tile into the
vehicle. (Lewis Dep. 67:1-20; Dkt. 76-6 at 67).

Plaintiff did not fill out an incident report that day, and did not discuss the
incident with any Menards employees. (Lewis Dep. 47:2-48:3; Dkt. 76-6 at 47-48).
After the fall, before leaving, Mr. Lewis did not mention any problems with the

roadway, ramp, threshold, or anything else to any Menards employees. (Lewis Dep. 50:14-17; Dkt. 76-6 at 50).

The following day, June 12, 2017, Mr. Lewis returned to Menards to fill out an incident report. (Lewis Dep. 65:16-20; Dkt. 76-6 at 65). He then went to the exit and took a picture of the pavement where he fell, and at that time believed the threshold between the ramp and pavement was a safety hazard. (Lewis Dep. 67:24-68:23; Dkt. 76-6 at 67-68). Mr. Lewis did not tell anyone at Menards that he thought there was a defective condition on the property. (Lewis Dep. 68:24-69:8; Dkt. 76-6 at 68-69). Mr. Lewis testified that he thought the area between the exit sidewalk and parking lot pavement was in disrepair and caused the cart to fall on him. (Lewis Dep. 79:16-80:14; Dkt. 76-6 at 79-80).

Brett Roehl, Service Coordinator for Menards, reviewed in his deposition the service report that indicated various areas on the property that were approved to be repaired; Mr. Roehl testified that he would not consider those areas as trip hazards and that language was used by the third-party asphalt servicer. (Roehl Dep. 25:4-26:14; Dkt. 83-2 at 7). When reviewing the photo taken by Mr. Lewis on the day after his fall, Mr. Roehl testified that he did not see any type of repair that was needed because there was no elevation change or uneven surface of any kind. (Roehl Dep. 47:24-48:2; Dkt. 83-2 at 12). After reviewing the surveillance video, Mr. Roehl concluded that there was no issue with Plaintiff's cart crossing the threshold from the sidewalk to the parking lot pavement. (Roehl Dep. 49:3-12; Dkt. 83-2 at 13).

Mr. Lewis filed the present claim in Marion County Superior Court on August 1, 2018 alleging that he suffered damages as a result of Menards's negligence. (Dkt. 1-1 at 4). The matter was removed to this Court on August 28, 2018 on the basis of diversity jurisdiction. 28 U.S.C. § 1332. (Dkt. 1).

## II.   Legal Standard

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing the absence of genuine issues of material fact. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). If the moving party carries its burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley,* 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks

omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

## III.   Discussion

The Defendant, Menard, Inc. ("Menards"), filed its Motion for Summary Judgment on September 25, 2020, arguing that there is no evidence that a defect existed in the pavement or that Menards had any notice of the same. (Dkt. 71 at 10). Specifically, Menards argues that it had no actual or constructive knowledge of any alleged defect in the walking surface over which Mr. Lewis fell. (Id. at 10, 12-13). Furthermore, even if there was a defect in the walking surface, that defect was not a proximate cause of the incident. (Id. at 10-11). Mr. Lewis filed his response on November 6, 2020 and asserts that genuine issues of material fact exist as to whether Menards breached its duty, thereby precluding summary judgment. (Dkt. 83). Menards filed its reply on November 20, 2020. (Dkt. 87). Plaintiff filed a surreply on November 25, 2020. (Dkt. 88).[1] After the parties had completed briefing,

---

[1] Plaintiff's surreply was filed in accordance with S.D. Ind. Local Rule 56-1(d) in order to respond to Defendant's objections as to the admissibility of certain evidence. The Court considers only the surreply arguments related to evidence admissibility.

the Court denied the Defendant's request to exclude Plaintiff's expert, and permitted the parties to conduct additional expert discovery through March 1, 2021. (Dkt. 90). At the Court's request, the parties presented supplemental briefing on whether Plaintiff's expert's additional testimony should affect the Court's summary judgment analysis. (Dkts. 99, 101, 103).

The Court's jurisdiction over this matter is based on diversity pursuant to 28 U.S.C. § 1332; therefore, substantive principles of state law apply to Mr. Lewis's claim. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 527 (1996). Under Indiana law, a negligence action contains three elements. *City of S. Bend v. Dollahan*, 918 N.E. 2d 343, 352 (Ind. Ct. App. 2009). To succeed on his negligence theory of premises liability under Indiana law, Mr. Lewis must establish that: (1) Menards had a duty to conform its conduct to a standard of care arising from its relationship with him, (2) Menards failed to conform its conduct to that standard of care, and (3) Mr. Lewis sustained an injury proximately caused by Menards's breach. *Id.*

"The status of a person who comes onto land is key in determining the duty a landowner owes to that person." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1088 (7th Cir. 2018). "Under Indiana premises-liability law, a landowner owes a business invitee a duty to exercise reasonable care for their protection while they remained on the premises." *Waldon v. Wal-Mart Stores, Inc., Store No. 1655*, 943 F.3d 818, 822 (7th Cir. 2019) (internal quotations and citations omitted). It is undisputed that Mr. Lewis was a business invitee of Menards and, therefore, Menards owed him a

duty to exercise reasonable care for his protection. *Schulz v. Kroger Co.*, 963 N.E. 2d 1141, 1144 (Ind. Ct. App. 2012) (citing *Burrell v. Meads*, 569 N.E. 2d 637, 642 (Ind. 1991)). Menards would breach this duty only if it:

   a) knows or by the exercise of reasonable care would discover the
      condition, and should realize that it involves an unreasonable risk of
      harm to such invitees; and
   b) should expect that the invitees will not discover or realize the
      danger, or will fail to protect themselves against it; and,
   c) fails to exercise reasonable care to protect them against the danger.

*Burrell,* 569 N.E. 2d at 640 (quoting Restatement (Second) of Torts § 343 (1965)). Each of these elements must be present for a landowner to be liable under a premises liability theory. *See Rogers v. Martin*, 63 N.E. 3d 316, 322 (Ind. 2016).

   *a. Dangerous Condition*

   All parties and witnesses agree that a threshold existed between the concrete ramp at the exit of the Menards store and the asphalt pavement on the parking lot; the only dispute is whether that threshold constituted an unreasonably dangerous condition. As an initial matter, the Court notes that the Plaintiff, Plaintiff's counsel, and the Plaintiff's expert all describe the threshold in different ways, and use interchangeable words such as crack, rut, and disrepair to refer to the dangerousness of the threshold.

   In his deposition testimony, Plaintiff maintains that the threshold constituted a dangerous condition because when his shopping cart's wheels hit this threshold, the cart stopped moving, the rear wheels went up, and the cart tipped over. (Lewis Dep. 53:18-24, 79:21-80:14; Dkt. 76-6 at 53, 79-80). Plaintiff consistently describes the threshold as something the cart wheels ran into, such

9

that the bottom of the cart hit a wall when it reached the asphalt and caused the back wheels to tip up. (Lewis Dep. 64:25-65:6, 80:6-8; Dkt. 76-6 at 64-65, 80). Plaintiff also mentions that a portion of the threshold was "chunked out" or "bumped up." (Lewis Dep. 61:16-17, Dkt. 76-6 at 61; Hicks Depo 227:4-8, Dkt. 71-11 at 18). Plaintiff and his counsel refer to the defect as a general "disrepair," but do not share many more details beyond that. As a result, it is somewhat unclear exactly what Plaintiff alleges the defect in the threshold to be. Plaintiff's expert, however, concludes that the dangerousness of the threshold stems from the height difference between the asphalt and the concrete. (Hicks Report, Dkt. 99-6 at 4-5). This claim also appears at various times throughout the Plaintiff's briefing on summary judgment. (Dkt. 83 at 18-19; Dkt. 88 at 2; Dkt. 101 at 4).

Looking to the totality of the evidence and arguments, the Court concludes that the Plaintiff is claiming that the threshold at the exit of Menards was dangerous because of the height difference between the asphalt and concrete. This conclusion (1) tracks with Plaintiff's deposition testimony that the shopping cart's wheels ran into something and stopped, (Lewis Dep. 64:25-65:6, 80:6-8; Dkt. 76-6 at 64-65, 80); (2) conforms to Plaintiff's argument in the briefing that the repair of the threshold to make it a more even transition from concrete to asphalt is proof of Defendant's knowledge of a dangerous condition, (Dkt. 83 at 12-13); and (3) relies on Plaintiff's proffered expert's conclusion that the threshold's height difference between the asphalt and concrete constitutes a dangerous condition that was a proximate cause of Mr. Lewis's injury. (Hicks Report, Dkt. 99-6 at 4-5).

Here, Defendant argues that the undisputed material facts show that no dangerous condition existed at the time of Mr. Lewis's fall, primarily because there is no evidence as to the height difference between the concrete and asphalt and, as such, there is no evidence that would support a finding of dangerousness. (Dkt. 71 at 12-16). In response, Plaintiff asserts that four pieces of "Core Evidence" demonstrate that the threshold was unreasonably dangerous: (1) the surveillance video of the incident; (2) the photo taken by the Plaintiff the day after the incident; (3) Plaintiff's deposition testimony regarding how the accident happened; and (4) the testimony and documentation from Brett Roehl. (Dkt. 83 at 5-13).

       *i.   Surveillance Video*

Plaintiff contends that the surveillance video shows the threshold to be in disrepair, and that even a layperson would be able to see and understand that this level of disrepair constituted an unreasonably dangerous condition on the property. (Dkt. 83 at 5-6). Additionally, Plaintiff maintains that the video showed that no repairs had taken place, and that Defendant should have known of the harm presented based on the threshold's location immediately outside of the store's only exit. (Id. at 6). In the Court's view, however, the video is not clear or close enough to view the state of the threshold between the concrete and the asphalt. The video shows that the threshold exists, but it is impossible to tell the height difference of that threshold or whether it constitutes a dangerous condition on the Defendant's property. A layperson would not be able to use this surveillance video to determine the state of the threshold any better than the Undersigned could. Moreover, the

11

video clearly shows numerous other customers, who are walking, pushing shopping carts, or pushing flatbed carts, successfully traversing that same threshold on which Plaintiff alleges he fell. The surveillance video, even taken in the light most favorable to the Plaintiff, does not demonstrate the existence of a defect or unreasonably dangerous condition.

*ii. Plaintiff's Photograph*



As to the photograph taken by the Plaintiff the day after the incident, he maintains that this too shows the threshold in disrepair, and that the disrepair is so obvious that even a layperson could recognize the condition as being unreasonably dangerous. (Dkt. 83 at 7). On reviewing the photograph, the Undersigned can discern various cracks and imperfections in the threshold area, that appear to be the threshold and the lines between the pieces of concrete, but cannot tell the height difference between the concrete and asphalt; additionally, it is not evident that any of these features constitute disrepair, nor that these features would rise to the level of an unreasonable risk of harm. Moreover, as discussed before, it appears that the Plaintiff does not claim that any of the cracks in the concrete or asphalt caused the incident, but instead, he appears to claim that the height difference between the concrete and asphalt caused the cart to stop moving, the back wheels to lift off the ground, and the cart to tip over. (Lewis Dep. 64:25-65:6, 80:6-8; Dkt. 76-6 at 64-65, 80). Thus, a photograph showing various cracks and imperfections does nothing to support the Plaintiff's claim that the height difference between the concrete and asphalt caused the threshold to be unreasonably dangerous.

In addition, Mr. Roehl testified that this photograph shows no elevation change or uneven surface of any kind, and that no repair would be deemed necessary for this area. (Roehl Dep. 47:24-48:2; Dkt. 83-2 at 12). Both Plaintiff's expert, Mr. Richard Hicks, and Defendant's expert, Mr. Steven Rundell, agree that a certain level of change in elevation up to .25" between the concrete and asphalt is acceptable and reasonable under the relevant safety standards. (Rundell Report; Dkt. 71-5 at 20;

Hicks Dep. 225:2-4; Dkt. 71-11 at 16). In looking at this photo, it is not obvious to the Court, and it would not be obvious to a layperson, whether or not the height difference at the threshold between the concrete and asphalt is greater than .25" and, consequently, that the threshold constitutes an unreasonably dangerous condition.

### iii. Plaintiff's Deposition Testimony

Plaintiff next argues that his deposition testimony as to how the accident happened proves the existence of a dangerous, unreasonable defect at the threshold. (Dkt. 83 at 9). Plaintiff further maintains that he did not believe the threshold to be a dangerous condition until he returned to Menards the day after the incident to inspect the area. (Lewis Dep. 68:17-23; Dkt. 76-6 at 68).

First, the Court notes that the surveillance video evidence contradicts Plaintiff's testimony. The video does not show the shopping cart stopping at the threshold and tipping over; instead, the video clearly shows that the shopping cart's front wheels had no difficulty crossing the threshold and that the cart does not slow down when crossing the threshold. Plaintiff can testify as to what he saw, felt, and thought on the day of the incident, but that testimony is insufficient to support a finding that the threshold constituted a dangerous condition, especially here when his version of the facts is contradicted by the surveillance video. *See Scott v. Harris*, 550 U.S. 372, 378-81 (finding that despite having to draw reasonable inferences in favor of the non-moving party, the court was not required to believe the non-movant's version of events when a videotape exists that "utterly discredit[s]" it. The mere fact that the incident occurred does not automatically render the

14

threshold a dangerous defect on Defendant's property, especially given that the surveillance video directly contradicts Plaintiff's explanation of how the incident occurred. *See, e.g., Taylor v. Cmty. Hosps. of Indiana, Inc.*, 949 N.E.2d 361, 364 (Ind. Ct. App. 2011) ("The mere allegation of a fall is insufficient to establish negligence, and negligence cannot be inferred from the mere fact of a fall."); *Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Second, Plaintiff's expert's testimony also conflicts with Plaintiff's deposition testimony. (Hicks Dep. 108:5-13, 225:11-14; Dkt. 71-11 at 9, 16; Hicks Report; Dkt. 99-6 at 4). Plaintiff alleges that the asphalt was higher than the concrete, a feature he describes as a "bump-up," which caused the cart to feel as though it hit a wall when it ran into the threshold; Plaintiff's expert, however, concludes that the threshold was a dangerous condition because the asphalt was lower than the concrete, which caused the cart's center of gravity to shift and the cart to tip over. (Lewis Dep. 61:18-23, 79:21-80:9; Dkt. 76-6 at 61, 79-80; Hicks Report; Dkt. 99-6 at 4). Thus, Plaintiff's expert testimony also discredits Plaintiff's version of the facts.

Third, Plaintiff testified that he had traversed the Menards exit numerous times, including several times in the month prior to the incident, and had never had an issue with the threshold. (Lewis Dep. 6:23-7:16, 8:25-10:13; Dkt. 76-6 at 6-10). Perhaps more importantly, at no time prior to or contemporaneous with the incident

did Plaintiff ever think that the threshold was a dangerous condition; it was not until Plaintiff returned to Menards the day after the incident did he think that the threshold was dangerous. (Lewis Dep. 10:5-13, 68:17-23; Dkt. 76-6 at 10, 68). At the deposition, however, Plaintiff speaks generally about how the threshold was in disrepair, which led to him to conclude that it was dangerous, but fails to offer any specifics as to how that disrepair constitutes dangerousness. Plaintiff's testimony is thus contradicted by his own testimony, the surveillance video, and his own expert's testimony. Accordingly, Plaintiff's testimony does not support a finding that the threshold was a dangerous condition.

> *iv. Brett Roehl*

Finally, Plaintiff contends that the testimony of Brett Roehl, along with the photograph of the incident area outlining the areas in need of repair, show evidence of a dangerous condition in the area where Plaintiff fell. (Dkt. 83 at 10-12). Plaintiff argues that a layperson can view the photograph and see that the threshold was dangerous and presented an unreasonable risk of harm. (Id. at 12). Plaintiff also maintains that Mr. Roehl's testimony that the threshold was repaired within a few months after the incident demonstrates that the threshold was a dangerous condition on the property of which Defendant was aware. (Id.).



The photograph in question depicts the threshold over which Plaintiff alleges

he fell, with a typewritten description of the area stating: "Area #2- 21'x2' Mill 2"

(42 SF); Notes: Trip Hazard, repaint after repair." Mr. Roehl testified that a third-

party vendor took the photograph during an inspection of the Menards property and

typed the description. (Roehl Dep. 26:3-22; Dkt. 83-2 at 7). Defendant contends that

the typewritten description constitutes inadmissible hearsay, specifically the

portion that states "Trip Hazard." (Dkt. 87 at 8). Plaintiff seems to argue that this

evidence is not hearsay and is admissible on its face and does not directly address

Defendant's argument. (Dkt. 88 at 6-9). Courts may not consider inadmissible

hearsay when deciding a motion for summary judgment. *Carlisle v. Deere & Co.*,

576 F.3d 649, 655 (7th Cir. 2009).

The typewritten description came from a third-party vendor and Plaintiff

frequently refers to the phrase "Trip Hazard" as proof that Defendant was aware

that the threshold constituted a dangerous condition on the property; as such, the

typewritten description is an out of court statement used to prove the truth of the

matter asserted. Fed. R. Evid. 801(c). Plaintiff has not identified any hearsay

exception in which this statement might fall, and has not presented any argument that this statement does not constitute hearsay. As such, the Court concludes that the typewritten description from the third-party vendor on the photograph is inadmissible hearsay, and will not be considered in this opinion.

In looking at the photo itself without reference to the typewritten description, there is a section in handwriting that reads: "OK BR 3-24-17." Mr. Roehl agreed that this was his handwriting, and that he had approved this particular area for repair due to the pothole above the red number two. (Roehl Dep. 20:2-14; Dkt. 83-2 at 5). When asked about this photo, Mr. Roehl testified that he does not consider the threshold to be a trip hazard and does not know why the third-party vendor would refer to it as such. (Roehl Dep. 25:4-26:14; Dkt. 83-2 at 7). Mr. Roehl testified that the area outside of the Menards exit had not been identified or called out for repair under a 2016 inspection of the property. (Roehl Dep. 29:20-30:12; Dkt. 83-2 at 8). Further, Mr. Roehl stated that only the area circled above the red number two had been approved for repair, due to the existence of a pothole; the area designated by a black X near the bottom of the image (the place where Plaintiff's incident occurred) had not been identified as in need of repair. (Roehl Dep. 34:20-35:2, 37:16-38:5, 46:21-47:1, 47:21-48:2; Dkt. 83-2 at 9-10, 12). As discussed *infra*, Plaintiff's use of the fact that the threshold area was repaired after the incident is an impermissible use of a subsequent remedial measure and will not be considered here. Regardless, Mr. Roehl's testimony does not support Plaintiff's claim that the threshold constitutes a dangerous condition. It is not possible to tell when looking at the photo

alone whether the threshold is dangerous, and Mr. Roehl's testimony tends to prove that it is, in fact, not dangerous.

    v.  *Expert Testimony*

While it may be within a layperson's understanding to look at photos and videos and recognize cracks and thresholds in asphalt and concrete, it is not within a layperson's understanding to know whether those features constitute a dangerous condition with an unreasonable risk of harm. In this case, both parties' experts agree that the threshold must be evaluated against the relevant safety standards that govern walkways, and further agree that the main dispute as to the safety of the threshold here was the change in elevation between the asphalt and the concrete. Perhaps most importantly, both experts agree that a change in elevation up to .25" is considered reasonable and appropriate under the relevant safety standards.

Plaintiff's expert's original theory was that the shopping cart had tripped on the edge of the threshold, similar to a pedestrian tripping over a raised curb (Hicks Report, Dkt. 99-6 at 7); after viewing a higher quality video of the surveillance tape, Mr. Hicks's theory became that the front wheels dropped from the concrete to the asphalt, which caused the center of gravity to shift forward and the cart to tip over. (Hicks Report, Dkt. 99-6 at 4-5). Plaintiff's expert does not know the height difference between the asphalt and concrete at the threshold, but estimates it to be somewhere between .3" and .57" by looking to other portions of the Menards parking lot – notably, however, Mr. Hicks concedes that there is no way to know the

exact height of the threshold at the time of the incident and that it might have been within reasonable and safe limits. (Hicks Report; Dkt. 99-6 at 4; Hicks Dep. 197:9-17; Dkt. 71-11 at 15). Addressing both of Mr. Hicks's theories, Defendant's expert affirmatively concluded, based on his testing, that the threshold could not have had an incline of more than .25" in height, otherwise the cart would have stopped when it hit the threshold, or a decline of more than .25" in height because the cart in testing had no difficulty traversing a drop-off of .75". (Rundell Report; Dkt. 71-5; Rundell Supplemental Report; Dkt. 99-8).

At this time, Plaintiff's expert concludes that the threshold constituted a dangerous condition, while Defendant's 30(b)(6) witness and expert maintain that the threshold was not dangerous. It is not for the Court to decide which expert is correct at this stage; instead, the Court finds that the parties' experts have presented a genuine issue of material fact as to the height difference at the threshold, an issue which will inherently determine whether the threshold can be considered a dangerous condition. Even assuming that a jury would find the threshold to be a dangerous condition on the property, the Court must determine whether the Defendant is entitled to summary judgment due to a lack of knowledge.

### b. *Knowledge of Condition*

Before liability may be imposed on the landowner, it must have "actual or constructive knowledge of a condition on the premises that involves an unreasonable risk of harm to invitees." *Pfenning v. Lineman*, 947 N.E. 2d 392, 406 (Ind. 2011); *see also Schulz*, 963 N.E.2d at 1144 ("[B]efore liability may be imposed

on the invitor, it must have actual or constructive knowledge of the danger."). Menards maintains that it is entitled to judgment as a matter of law because it had no actual or constructive knowledge of a defect in the area of the parking lot where the Plaintiff fell. (Dkt. 71 at 13). Mr. Lewis in response argues that Menards had both actual, affirmative knowledge and constructive knowledge that the threshold was a dangerous condition. (Dkt. 83 at 5-12). Specifically, Plaintiff points to the same four pieces of "Core Evidence" to support this claim: the surveillance video, Plaintiff's testimony, Plaintiff's photograph, and the testimony from Brett Roehl. (Id.).

Reviewing this evidence, the Court concludes that Menards had no actual or constructive knowledge that the threshold where Mr. Lewis fell was dangerous. Plaintiff had traversed the threshold numerous times in the year prior to the incident, both with and without shopping carts, and had never believed the threshold to be dangerous or had any difficulty crossing the threshold. Plaintiff did not inform Menards that he felt the threshold to be dangerous or defective at any time before, during, or after the incident. Furthermore, there is no evidence in the record to demonstrate any employee or customer ever identifying the portion of the threshold on which Mr. Lewis fell as a danger. Additionally, the third-party vendor who annually inspected the entrances, exits, and parking lot identified no problems where Mr. Lewis fell. The testimony and documentation from Brett Roehl are similarly unavailing. Mr. Roehl specifically testified that there was no defect in the

area in which Plaintiff fell, and that only the nearby pothole was a defect that had been identified for repair.

Plaintiff argues at length that the fact that the entire threshold area was repaired after the incident demonstrates that Menards knew the threshold was a dangerous condition on the property. In reviewing the testimony of Menards's corporate representative, Mr. Roehl, it does not appear that Menards was aware that the *entire* threshold was dangerous, but rather that only the pothole near where Mr. Lewis fell was dangerous. Mr. Roehl testified that there was no defect in the area where Mr. Lewis fell. Moreover, Defendant argues that the repair of the threshold constitutes a subsequent remedial measure under Federal Rule of Evidence 407, and that any such testimony would be inadmissible. The Court agrees. Plaintiff argues that he would only be introducing evidence that the threshold was repaired in order to impeach Mr. Roehl's testimony that the purpose of the repair was to fix a pothole near the threshold. Although Plaintiff is correct that impeachment is an exception to Rule 407's exclusion of subsequent remedial measures, Plaintiff's explanation of the use of this information is slightly inaccurate. Throughout the briefing, Plaintiff frequently mentions that Mr. Roehl's approval of the pothole repair at the exit and the subsequent repair of the entire threshold demonstrate Defendant's knowledge that a dangerous condition existed. This use of the information is improper under Rule 407 and, as such, evidence of the subsequent repair in relation to any knowledge or culpability of Defendant is inadmissible.

Thus, based on the Plaintiff's proffered "Core Evidence," the Court concludes that no reasonable juror could find that Menards had actual or constructive knowledge that the portion of the threshold on which Plaintiff fell was a dangerous condition that constituted an unreasonable risk of harm. As such, even if the Court conceded that a dangerous condition existed, Defendant is still entitled to summary judgment due to its lack of knowledge.

## IV.    Conclusion

For the reasons stated above, the Defendant's Motion for Summary Judgment, Dkt. [70], and Defendant's Supplement to the Motion for Summary Judgment, Dkt. [99], are **GRANTED**. Final judgment in favor of Defendant will be entered accordingly.

So ORDERED.


Date: 7/27/2021

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana



Distribution:

All ECF-registered counsel of record via email